UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

ROBERT TODD GRIFFIN                    CIVIL ACTION NO. 3:12-cv-3163
    LA. DOC #228558

                                           SECTION P

VS.

                                           JUDGE JAMES T. TRIMBLE, JR.

WARDEN TIMOTHY KEITH                   MAGISTRATE JUDGE HAYES

## REPORT AND RECOMMENDATION

*Pro* se Petitioner Robert Todd Griffin, an inmate in the custody of Louisiana's

Department of Corrections, filed the instant Petition for writ of *habeas corpus* pursuant to 28

U.S.C. § 2254 on December 27, 2012.  [doc. # 1].  Petitioner attacks his 2008 conviction for

second degree robbery and the forty year sentence imposed by the Sixth Judicial District Court,

Tensas Parish.  This matter has been referred to the undersigned for review, report, and

recommendation in accordance with the provisions of 28 U.S.C. § 636 and the standing orders of

the Court.

## Background

The underlying facts in this case have been set forth by the Louisiana Second Circuit

Court of Appeal as follows:

> Just before 4:00 a.m. on the morning of October 15, 2004, deputies from the Tensas
> Parish Sheriff's Office ("TPSO") responded to a call for assistance at the residence
> of Mr. James Hill. Deputies David Lee and Mark Guy responded to the call and
> arrived at Mr. Hill's house at the same time as the arrival of Mr. Hill's daughter,
> Carolyn Crow. When the deputies arrived, they saw Mr. Hill, who was 85 years old
> and legally blind, standing in the carport appearing badly beaten. His pajamas were
> torn, his left eye was black and he had blood on his face and ear. Deputy Lee testified
> that, at first, Mr. Hill could only respond with "ahh-haaa, ahh-haaa" when asked what
> had happened; but, shortly thereafter, Mr. Hill was able to say, "He's inside. He's
> inside." Ms. Crow took her father to her car while the deputies entered the residence
> to search for the suspect.

According to Ms. Crow, once they got into her car, her father told her that he had been awakened earlier that morning by a knock on the door. Mr. Hill related to her that a man was at his door who said that his car had broken down and wanted to use the phone to call someone to pick him up. Mr. Hill related that the man identified himself as "Mike Hale."[1]  Mr. Hill let the man into his home to use the phone. After the man got off the telephone,[2] he asked Mr. Hill where Mr. Hill kept his money. Mr. Hill responded that he did not have any money, and the man then began to beat Mr. Hill.

As Ms. Crow spoke with her father, the deputies searched the house. They found that the back door was partly open. When they entered the home, they saw that a reclining chair had been turned over onto its back. As they continued to search the home, the deputies heard snoring. They found Defendant asleep on the kitchen floor. Defendant smelled strongly of alcohol and the upper portion of his back was covered with fresh feces. Deputy Lee recognized Defendant as Robert Todd Griffin, a person he knew. The deputies rolled Defendant over, handcuffed and searched him. The deputies found a wallet in Defendant's back pocket that belonged to Mr. Hill and contained Mr. Hill's state-issued identification card.[3]  According to Ms. Crow, Mr. Hill kept his wallet on furniture near his bed or in a vanity drawer when he slept. In a continued search of the home, the deputies found blood spots on Mr. Hill's bed by the pillow. Outside the home, the deputies found Defendant's vehicle in Mr. Hill's side yard, the portion of the yard away from the street.

After the deputies arrested Defendant, they placed him into a patrol car. Deputy Guy and Ms. Crow then assisted Mr. Hill back into the home and sat him in the recliner. Deputy Guy testified that Mr. Hill was "nervous, ... hurt," dazed and walking slowly with assistance just before the interview; he was still bleeding and was being attended by paramedics. According to the testimony of Ms. Crow, her father told the deputy the same story he had just relayed to her about the incident. Deputy Guy also testified that Mr. Hill reported being knocked unconscious by the beating. Deputy Guy did not include Mr. Hill's statements in the initial incident report, but included some of that information in a subsequent report.

---

[1] This is a person who, along with Defendant, had done some work at the victim's property in the past.

[2] Defendant called his mother to come and pick him up. His mother traveled to Mr. Hill's home, but no one answered the door when she arrived, so she left.

[3] While Defendant was in jail, his mother retrieved Defendant's belongings; among the belongings was a watch that belonged to Mr. Hill.

A toxicology report later showed that Defendant had alcohol, cocaine, Xanax and marijuana in his system when he was arrested. He was unable to sign his name when he was booked at the jail and appeared as if he had had too much to drink. A Ph.D. psychologist who subsequently interviewed Defendant and reviewed the evidence opined that Defendant's ability to form intent or a plan would have been impaired due to Defendant's consumption of drugs and alcohol prior to the crime, but admitted, however, that his opinion was based primarily on what Defendant told him about the incident. In addition, there was evidence which suggested that Defendant made an effort to escape from an encounter with police earlier that evening by leaving a bar when police were called and, further, that Defendant parked his car on the lakeside, or backside, of Mr. Hill's house in a way calculated to escape attention.

A second Ph.D. psychologist who reviewed the evidence opined that it was possible that a person who had behaved as Defendant had could have been capable of forming intent despite drug use.

After several continuances requested by Defendant, trial in this matter commenced on May 5, 2008. Defendant waived trial by jury. Mr. Hill passed away prior to the trial, and his testimony had not been taken prior to his death. Just prior to trial, Defendant requested yet another continuance based upon his alleged inability to assist his lawyer due to the effects of post-surgical medications that he was taking.[4] In response to the motion, the trial judge spoke with a physician, Dr. Neumann, by telephone on May 5, 2008, the morning of trial. Dr. Neumann had examined Defendant that morning and was familiar with the medications Defendant was taking. The record contains the trial judge's recitation of the conversation, including that Dr. Neumann had opined that Defendant would be "drowsy, but not stuporous," and that Defendant had "a good understanding of the operation of a trial." Defendant's attorney and the prosecutor were present in chambers during the telephone conversation, which was not held as a conference call due to technical difficulties. Defendant's attorney argued that, while Defendant "could probably assist me in the defense," he might suffer prejudice due to his medicated condition should he choose to testify. Ultimately, the trial judge denied Defendant's motion for a continuance in reliance on the physician's opinion that Defendant could go forward with the trial.

During the trial, both Ms. Crow and Deputy Guy testified, over repeated objections of Defendant's attorney and motion *in limine*, about Mr. Hill's statement to them in the half hour or so after the incident. The court relied on these witnesses' recollection of the dazed mental state of Mr. Hill and the close proximity in time of the statements to the event in finding that the statements were admissible into evidence as excited

---

[4] Defendant was not incarcerated pending trial. He was under house arrest and had undergone surgery. At the time of trial, Defendant was taking prescribed drugs, including Lorcet, Xanax, Zoloft, and Trazedone.

utterances of Mr. Hill.

Near the end of the first day of trial (May 5, 2008), the trial judge made the following observation regarding the capacity of Defendant to proceed and assist his defense counsel:

> I'm gonna say something for the record. I don't think there is any objection to this. But I just think the record should reflect that Mr. Griffin, and I'm not sure what the difference is as far as his medication goes today, but he's obviously functioning at a more alert level. And I think it's appropriate for the record to say that. And, you know, if anybody wants to comment on it or make some other statement, they may. But, I think the record should reflect that from the Court's perspective, he's obviously assisting counsel ably and functioning without the drowsiness that appeared yesterday.

There were no further comments regarding that issue.

*State v. Griffin*, 30 So. 3d 1039, 1042-44 (La. App. 2 Cir. 2010).

On November 22, 2004, Petitioner was charged by bill of information with one count of second degree robbery.  [doc. # 12-1, p. 57].  On May 7, 2008, the trial judge found Petitioner guilty.  [doc. # 12-6, p. 184].  On July 2, 2008, the trial judge sentenced Petitioner to serve forty (40) years at hard labor.  [doc. # 12-3, p. 118; # 12-7, p. 14].

On October 8, 2009, Petitioner, represented by counsel, appealed to the Second Circuit Court of Appeal and raised the following assignments of error: (1) Petitioner was denied his Sixth Amendment right to confront his accusers; and (2) Petitioner was denied his Sixth Amendment right to a fair trial.  [doc. # 12-7, p. 28].  On November 13, 2009, Petitioner filed a *pro se* brief and argued that he was denied his right to a contradictory hearing pursuant to LA. CODE CRIM. PROC. art. 647, as well as his right to have all conferences recorded pursuant to LA. CODE CRIM. PROC. art. 843.  *Id.* at 71.  On January 27, 2010, the appellate court affirmed Petitioner's conviction.  *Id.* at 131.  The Louisiana Supreme Court denied Petitioner's application

4

for writs on September 17, 2010.  [doc. # 12-8, p. 13].  Petitioner did not seek further direct review in the United States Supreme Court.

On April 7, 2011, Petitioner filed a *pro se* application for post-conviction relief in the trial court and raised the following assignments of error: (1) police and prosecutorial misconduct; (2) denial of the right to testify; (3) denial of the right to trial by jury; (4) trial court error; (5) ineffective assistance of appellate counsel; (6) ineffective assistance of trial counsel; (7) insufficient evidence; and (8) cumulative error.  [doc. # 12-8, p. 18, 39].  On June 9, 2011, the trial court summarily dismissed Claims 1, 2, 4, 7, and 8 and ordered the State to file a response to the remaining claims.  [doc. # 4, p. 145].  On August 31, 2011, following the State's response, the trial court dismissed the remaining claims.  [doc. # 12-9, p. 45].

Petitioner sought further collateral review before the Second Circuit Court of Appeal on August 1, 2011, and raised the following claims: (1) the trial court erred in summarily dismissing claims 1, 2, 4, 7 and 8; and (2) the trial court erred in denying a motion to produce documents. *Id.* at 48.  On September 1, 2011, the Second Circuit denied Petitioner's application for relief. *Id.* at 69.  On September 21, 2011, Petitioner filed a second application for writ of review before the Second Circuit and claimed: (1) the trial court erred in summarily dismissing claims 1, 2, 4, 7, and 8; (2) the trial court erred when it denied post-conviction relief without allowing Petitioner the opportunity to file a supplemental application; and (3) the trial court erred in failing to conduct an evidentiary hearing.  *Id.* at 76.  The Second Circuit denied this application on November 17, 2011.  *Id.* at 87.  The Louisiana Supreme Court likewise denied Petitioner's application on August 22, 2012.  [doc. # 12-10, p. 36].

Petitioner filed the instant Petition on December 27, 2012, requesting relief for the

following claims: (1) Petitioner was incompetent to stand trial; (2) Confrontation Clause violation; (3) Ineffective Assistance of Counsel; and (4) Inadequate Access to Post-Conviction Relief.  [doc. # 1].

The matter is now before the Court.

## Law and Analysis

### I.      Standard of Review – 28 U.S.C. § 2254

The Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996, 28 U.S.C. § 2254, governs *habeas corpus* relief.  The AEDPA limits how a federal court may consider *habeas* claims. After the state courts have "adjudicated the merits" of an inmate's complaints, federal review "is limited to the record that was before the state court[.]"  *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).  An inmate must show that the adjudication of the claim in state court:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

A decision is "contrary to" clearly established Federal law "if the state court arrives at a conclusion opposite to that reached by . . . [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts."  *Dowthitt v. Johnson*, 230 F.3d 733, 740-41 (5th Cir. 2000) (quoting *Williams v. Taylor*, 529 U.S. 362 (2000)).  "The 'contrary to' requirement refers to holdings, as opposed to the dicta, of . . . [the Supreme Court's] decisions as of the time of the relevant state-

court decision." *Id.* at 740.  Under the "unreasonable application" clause, a federal *habeas* court

may grant the writ only if the state court "identifies the correct governing legal principle from . . .

[the Supreme Court's] decisions but unreasonably applies the principle to the facts of the

prisoner's case." *Id.* at 741.

Section 2254(d)(2) speaks to factual determinations made by the state courts.  Federal

courts presume such determinations to be correct; however, a petitioner can rebut this

presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

**II.      Petitioner's Claims**

A. Claim One: Incompetent to Stand Trial

Petitioner first claims that, due to his medication-induced, intoxicated state, he was

incompetent and was improperly tried on the first day of trial.  [doc. # 1, p. 5, 17; # 6, p. 12-17].[5]

In addition to arguing that the trial judge's initial competency determination was incorrect,

Petitioner also argues that the trial court should have held an additional, more thorough

competency hearing following that initial determination because it was only then that the judge

became aware of Petitioner's slurred speech and intoxicated condition.  *Id.*

The Due Process Clause prohibits prosecution of a defendant who is not competent to

stand trial.  *Washington v. Johnson*, 90 F.3d 945, 949-50 (5th Cir. 1996) (citing *Cooper v.*

*Oklahoma*, 517 U.S. 348, 354 (1996)).  The test for determining competency is whether the

defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of

rational understanding . . . and a rational as well as factual understanding of the proceedings

_____

[5] Petitioner asserted that he was "tried while incompetent," [doc. # 6, p. 12], but later
clarified that he was only claiming incompetence for the first day of trial.  *Id.* at 17.

against him." *Cooper*, 517 U.S. at 354 (citing *Dusky v. U.S.*, 362 U.S. 402, 402 (1960)).  A

*habeas* Petitioner bears a heavy burden in contesting his competency during federal collateral

review because a state court's competency finding is presumed correct.  *DeVille v. Whitley*, 21

F.3d 654, 656 (5th Cir. 1994); *see also Thompson v. Keohane*, 516 U.S. 99, 111 (1995) (noting

that competency to stand trial is a factual issue entitled to a presumption of correctness).

        Here, the Second Circuit set forth the relevant background, and proceeded to rule, as

follows:

> The record in this case demonstrates that the trial judge gave thoughtful consideration
> to Defendant's request for a continuance based upon his mental condition. The court
> had Defendant questioned by a physician on the morning before trial began, and the
> court then conferred with the physician by telephone. Defendant's primary objection
> to proceeding with the trial was his fear that, if he testified, he might suffer prejudice
> due to his being medicated.  In fact, Defendant's attorney expressed some confidence
> that Defendant could assist in the conduct of the trial. Although there is no transcript
> of the conversation between the physician and the trial judge, the record reflects that
> Defendant's attorney heard parts of the conversation when repeated out loud by the
> trial judge during the telephone conversation. In addition, we note that Defendant's
> attorney was able to assist the court in recalling what the doctor had said during that
> telephone conversation.[6]
>
> We conclude that the record is adequate to show that the trial court's decision is
> supported by the evidence available to the court at the time the decision was made.
> Further, the record shows that the court's decision was correct; the examining
> physician's opinion was that Defendant would be drowsy, but not stuporous, during
> the trial. The trial judge had the opportunity to examine Defendant personally and
> decide whether he was competent to proceed.

*Griffin*, 30 So. 3d at 1049.  Initially, the Court finds that Petitioner has failed to come forth with

clear and convincing evidence to rebut the presumption of correctness accorded to the trial

---

[6] The trial colloquy between defense counsel and the trial judge can be found in
Document 12-5 on pages twenty-one through twenty-four.

court's competency findings.[7]  Taking that finding into consideration, the Court agrees with the Second Circuit's assessment of the trial judge's findings and, therefore, cannot say that the appellate court's ruling was contrary to the holding in *Cooper* or that the appellate court's decision was based on an unreasonable determination of the facts in light of the evidence presented at trial.  Accordingly, this portion of Petitioner's claim is without merit.

The Court likewise finds the second portion of Petitioner's argument—that the trial judge should have held a competency hearing as soon as new evidence of Petitioner's alleged incompetency was brought to the judge's attention—without merit.  The following exchange took place immediately following a motion to suppress hearing:

> Defense Counsel: In light of the Court's ruling, Mr. Griffin would move to withdraw his previously entered plea of not guilty and enter a plea of guilty reserving his right to appeal.
>
> * * *
>
> Court: All right, and what's the agreed upon sentence?
>
> Defense Counsel: Eighteen years, Your Honor, with credit for time served.
>
> State: And that credit, Your Honor, is the time that he actually served in jail, not the house arrest.
>
> Court: All right.  All right, Mr. Griffin, based on your condition, I'd like for you to just talk into the microphone that's right there in front of you.  You may remain seated but I'm gon' need to ask you about your rights and understanding of your rights.

---

[7] Petitioner presents evidence indicating that Dr. Neumann, the physician that examined Petitioner the morning before trial began, was the victim's family physician.  [doc. # 42-2, p. 7]. It seems that Petitioner is arguing that, had the trial judge been aware of this conflict of interest, he would have found Petitioner incompetent to stand trial.  In that vein, however, the Court does not find that Petitioner's evidence constitutes the clear and convincing evidence necessary to rebut the trial judge's ultimate finding of fact, especially considering that the final determination of a defendant's competency to stand trial is a legal issue, not a medical issue.

Petitioner: I don't feel like I'm in any condition right now to make that decision, Your Honor.  If we wanna call, there's no feel like I . . . . . . Everything that was said was above my head what was going on in there.

Defense Counsel: Todd, I talked with you and your mother at length.

Petitioner: And we also talked about four dollars, four years of home incarceration why I missed a grown, five years of my son growing up.  I have not committed no law violations, lost a eight hundred dollar a week job, a fell behind in child support, and she saying I'm not getting credit for that so.

Defense Counsel: I told you you were not gon' get credit for the cost of incarceration.  And, I meant, your choices are either accept the plea agreement that we outlined where I negotiated so we could have the probably an appeal, or if we go to trial and there is no plea offer.  It's that simple, Mr. Griffin.

Petitioner: Okay, we'll go to trial.

State: No objection, Your Honor.

Court: Okay.

Petitioner: No objection whatsoever.

Court: All right, Mr. Griffin you understand that that decision is final.  If you come tomorrow that offer is gone.

Petitioner: All right.  I'm in no decision to make that call right now, Your Honor.  I

Defense Counsel: Will you give me ten minutes to talk to him in private?

Court: It's all right with me if it's all right with the State.

State: It's fine, Your Honor.  I just want him to understand that the Court has ruled that he is competent to stand trial tomorrow, and that if he doesn't take this plea today that he will go forward with a trial tomorrow.

Petitioner: Where is it real competent, where is it real competent to stand tomorrow at? I don't

State: The judge has already ruled that you're competent to stand trial for tomorrow.

Petitioner: Oh, okay, that's your rule.

Court: All right.  Well we'll have, we'll take about a ten minute recess and we'll be back in court.

[doc. # 12-5, p. 70-73].  Petitioner argues that his comments in the above colloquy were nonsensical and slurred due to his medicated condition.  [doc. # 6, p. 14].  He contends that the trial judge should have held an additional, more thorough competency hearing because his comments, as well as his condition, raised significant doubt as to his competence.

A defendant has a procedural due process right to a competency hearing when the evidence raises a *bona fide* doubt as to the defendant's competence at the time of trial and any immediately related proceedings.  *Pate v. Robinson*, 383 U.S. 375, 385 (1966); *McInerney v. Puckett*, 919 F.2d 350, 351 (5th Cir. 1990).  Courts consider three factors when determining whether *bona fide* doubt exists: the existence of any history of irrational behavior, the defendant's demeanor at trial, and any prior medical opinion rendered concerning the defendant's competency.  *Chenault v. Stynchcombe*, 546 F.2d 1191, 1193 (5th Cir. 1977) (citing *Drope v. Missouri*, 420 U.S. 162, 180 (1975)).

The trial court, on collateral review, denied Petitioner's claim and explained:

Mr. Griffin includes that portion of the transcript immediately preceding his waiver of jury trial when a plea agreement was brought to the court's attention.  Mr. Griffin, a career criminal, made several nonsensical statements.  His attorney, the District Attorney, and the court were all surprised.  The court was convinced that he was feigning incompetence to poison the plea agreement.  Within minutes of the nonsensical statements, he asked to waive a jury trial and be tried by the judge.  At this point his answers were intelligent, cogent, and rational.  The colloquy concerning his waiver of jury trial ended with Mr. Griffin saying, "[W]ell, certainly I don't want to inconvenience the jury.  And I do knowingly and intelligently waive the jury trial and allow the judge to hear it."

* * *

The contrived behavior of the defendant was dishonest on the day before his trial

began and remains so today.

[doc. # 12-9, p. 45].

Here, the Court finds that the scant evidence of Petitioner's nonsensical—and allegedly slurred—statements did not raise a *bona fide* doubt as to his competency so as to warrant re-evaluation.  The trial judge, likely based in part on the opinion of Dr. Neumann, already determined that Petitioner was competent prior to the colloquy cited above.  Judging from the record, it is clear that Petitioner's actions did not change the judge's initial determination because the judge accepted Petitioner's decision to decline the plea agreement and proceed to trial. Moreover, just as the state *habeas* court stated above, within minutes after the nonsensical statements, Petitioner made cogent, intelligent, and rational statements.  This rapid reversal in mood suggests that Petitioner was in fact feigning incompetence and, in addition, likely reinforced the trial judge's initial competency determination.

The evidence of Petitioner's episodic, nonsensical speech is insufficient to rebut the trial judge's implicit determination that a competency hearing was unnecessary.  The evidence is likewise insufficient to render the state *habeas* court's decision affirming the trial court's implicit ruling constitutionally intolerable.  That is to say, the state *habeas* court's conclusion that Petitioner was not entitled to relief under *Pate v. Robinson* was not an unreasonable application of Supreme Court precedent, wsa not contrary to Supreme Court precedent, and was not based on an unreasonable determination of the facts in light of the evidence presented at trial.  Petitioner's claim is without merit and should be **DENIED**.

B. Claims Two and Three: Confrontation Clause Violation

Petitioner argues that the trial court violated his Confrontation Clause rights when it

12

allowed Ms. Crow and Deputy Guy to testify about Mr. Hill's (the victim) statements to them. [doc. # 1, p. 7-8; # 6, p. 18].

i. <u>Mr. Hill's Statements to Ms. Crow</u>

When a *habeas* petitioner asserts that a trial court unconstitutionally admitted testimony against him in violation of the Confrontation Clause, the limited question is whether the state appellate court's decision to reject that claim was an objectively unreasonable application of the clearly established federal law set out in *Crawford v. Washington*, 541 U.S. 36 (2004).  The Supreme Court, in *Crawford*, drew a distinction between testimonial and non-testimonial hearsay and held that the Confrontation Clause applies only to the former category of statements.  *See Davis v. Washington*, 547 U.S. 813 (2006).  Thus, "whether a challenged statement falls within the class of evidence deemed 'testimonial' will generally be outcome-determinative."  *U.S. v. Holmes*, 406 F.3d 337, 348 (5th Cir. 2005).

Accordingly, in this case, unless the statements that Mr. Hill made to Ms. Crow qualify as "testimonial," *Crawford* is inapplicable and Petitioner's rights under the Confrontation Clause are not implicated.  The Second Circuit Court of Appeal set forth the relevant background, as well as its ruling, as follows:

> We agree with the trial court that the statements made by Mr. Hill to his daughter constitute excited utterances and were, therefore, properly admitted. Mr. Hill was initially unable to speak when his daughter arrived with the deputies, and his statements to her were made immediately after Mr. Hill was able to tell the deputies where to look for the suspect. The record shows that Mr. Hill was clearly still in a very excited state and had no time for reflective thought as he told Ms. Crow what had just happened to him. The trial court correctly concluded that Mr. Hill's statements to his daughter while in her car qualified as excited utterances.

A finding that Mr. Hill's statements to his daughter qualify as excited utterances does not, however, end the inquiry. Although the "excited utterance" exception to the hearsay rule has been described as a "firmly rooted" exception, *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), holds that the confrontation clause of the Sixth Amendment acts as an absolute bar on the admission of all out-of-court testimonial evidence unless (1) the witness who made the statement is unavailable to testify in court, and (2) the defendant had a prior opportunity to cross-examine the witness. *State v. Ealy*, 44,252 (La. App. 2d Cir. 5/13/09), 12 So.3d 1052.

In the instant case, the witness was unavailable to testify because he died prior to the trial, and Defendant did not have the opportunity to cross-examine Mr. Hill prior to his death. Accordingly, the admissibility of the evidence under Crawford turns upon whether it was "testimonial."

The court in *Crawford* declined to provide an explicit definition of testimonial evidence, but the opinion explains:

> An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.

The fact that a statement is made to a person who is not a government officer does not, as a bright line, necessarily mean that the statement is not "testimonial" within the ambit of the Sixth Amendment. Courts have been much more reluctant, however, to find a statement made to a non-governmental officer to be testimonial. For example, in *State v. Heggar*, 39,915 (La.App. 2d Cir.8/17/05), 908 So.2d 1245, this court found the present-sense impressions of a victim made over the telephone to a witness immediately prior to the victim's murder to be non-testimonial in nature. There was nothing to suggest that the victim believed that his statements would ever be used for formal purposes such as a trial. *See also State v. Parks*, 08–423 (La.App. 5th Cir.11/25/08), 2 So.3d 470, *writ denied*, 09–0142 (La.10/2/09), 18 So.3d 101, discussing *Heggar* and similar cases.

There are several risks, however, in treating all statements to non-governmental actors to be non-testimonial in nature, such as the opportunity for the government to wrongfully procure testimony from such witnesses and the "backdoor" reintroduction of the shibboleth of reliability rejected in *Crawford*. In this case, we find that Mr.

14

Hill's statements to his daughter—although they accuse Defendant of a crime—are not testimonial within the ambit of the protection of the Sixth Amendment. The elderly victim, under the immediate stress of a robbery and beating, was explaining to his daughter how he came to be in his current condition. These are not the type of circumstances where an objective person in Mr. Hill's position would believe that his statements would be used in a subsequent proceeding like a trial. Rather, Mr. Hill was explaining his urgent circumstances and distressed condition to his own daughter while waiting for paramedics to arrive. There was no formality or reflection in Mr. Hill's statements; the suspect was still at large, presumably still a danger to others, and the elderly victim had immediate need of medical attention. Mr. Hill's statements to his daughter were not testimonial under the circumstances of their making. Hence, under the circumstances, the trial court did not err in allowing Mr. Hill's daughter to testify about what her father told her and in admitting this evidence to prove the truth of the matters asserted therein.

*Griffin*, 30 So. 3d at 1046-48 (internal footnote omitted).

Here, a review of the record shows that the appellate court's findings were entirely reasonable; thus, the Court cannot say that the state court's application of *Crawford* was objectively unreasonable.  Petitioner's claim that his right to confront his accuser was violated by the admission of the victim's statements is without merit and should be **DENIED**.

ii. Mr. Hill's Statements to Deputy Guy

The Supreme Court, in *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986), held that Confrontation Clause errors are subject to a harmless-error analysis.  "An error is harmless unless it had substantial and injurious effect or influence in determining the jury's verdict."  *Dorsey v. Stephens*, 720 F.3d 309, 318 (5th Cir. 2013) (citing *Fry v. Pliler*, 551 U.S. 112, 116 2007)).  In addition, whether a Confrontation Clause error is harmless in a given case depends upon a host of factors, including "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the

testimony of the witness on material points, the extent of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Van Arsdall*, 475 U.S. at 673.

The Second Circuit Court of Appeal found that the trial court's decision to admit Deputy Guy's testimony violated *Crawford*, and, consequently, the Confrontation Clause, because Mr. Hill's statements to Deputy Guy were testimonial in nature.  However, the court found that trial court's decision constituted harmless error.  The Second Circuit explained its ruling as follows:

> We further find that Mr. Hill's statements to the deputy were also inadmissible under *Crawford*, *supra*, as they were testimonial in nature.[8] These statements were made to a government officer after the arrest of the suspect, and statements such as those Mr. Hill made to the deputy might be expected by an objective person to be used in a trial setting. Although the State argues that the statements to the deputy were not testimonial because they were made to enable police assistance to an ongoing emergency, that assertion is not well supported by the facts. Defendant was under arrest when the statements were made and the statements were offered, in part, to prove that Defendant beat Mr. Hill and took his property. Thus, Mr. Hill's statements to police were "testimonial" within the meaning of *Crawford*.

> Confrontation rights claims, however, are subject to harmless error analysis.  *State v. Ealy, supra, citing Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *State v. Robinson*, 01–0273 (La.5/17/02), 817 So.2d 1131. The inadmissible testimony of Deputy Guy was largely cumulative of the admissible testimony of Mr. Hill's daughter. Ms. Crow's testimony proved that Defendant was the person who beat Mr. Hill and that the beating was concomitant with the robbery. Moreover, the circumstantial evidence in this case was simply overwhelming. In this regard, we note that the defense at trial focused primarily on Defendant's ability to form the requisite mental state due to his intoxication at the time of the offense, not that Defendant did not commit the offense.

---

[8] The Second Circuit previously found that the statements to the deputy were improperly admitted under Louisiana law as excited utterances.

16

> In summary, although the trial court erred in some respects in its handling of these evidentiary matters, the admissible evidence was sufficient to prove Defendant's guilt beyond a reasonable doubt, and any error in the admission of the cumulative hearsay evidence was harmless beyond a reasonable doubt. Accordingly, this assignment of error is without merit.

*Griffin*, 30 So. 3d at 1047-48.

Upon review of the appellate court's ruling, along with a review of the record, the Court agrees with the appellate court in that the evidence against Petitioner was overwhelming and the erroneously admitted testimony was largely cumulative.[9] Thus, the Court finds that the Louisiana Second Circuit's analysis and ruling does not constitute an unreasonable application of Supreme Court law.  The appellate court properly engaged in a harmless error analysis in accordance with the Supreme Court decision in *Delaware v. Van Arsdall*.  Accordingly, Petitioner's claim is without merit and should be **DENIED**.

C: Claims Four, Five, and Six: Ineffective Assistance of Counsel

Petitioner claims that his trial counsel was ineffective because counsel refused to let Petitioner testify and because counsel failed to investigate an expert witness prior to presenting the witness's testimony at trial.  [doc. # 6, p. 24, 27].  Petitioner also claims that his appellate counsel was ineffective because counsel failed to make certain arguments and misstated the facts of the case.  *Id.* at 29.

---

[9] In fact, Petitioner concedes that the erroneously admitted evidence was largely cumulative.  He states, "the description of the event in question by Ms. Crow and Deputy Guy mirror each other regarding the blow by blow account of the alleged robbery . . . ."  [doc. # 45, p. 15].  To be clear, Petitioner does qualify this statement and argues that the two witnesses' testimony is contradictory in other respects; however, the Court finds Petitioner's proffered contradictions immaterial.

Ineffective assistance of counsel claims may be considered under 28 U.S.C. § 2254.  *See Clark v. Thaler*, 673 F.3d 410 (5th Cir. 2012); *Amos v. Thornton*, 646 F.3d 199 (5th Cir. 2011). Substandard advice of counsel rises to a constitutional violation only if the substandard conduct deprives the petitioner of his constitutional right to a fair trial or deprives the petitioner of some other constitutional right.  *Strickland v. Wash.*, 466 U.S. 668, 686-87 (1984).  To prevail on a claim of ineffective assistance of counsel, a petitioner must show that his counsel's actions fell below an objective standard of reasonableness and that the ineffectiveness of counsel prejudiced him.  *Id.*

If the petitioner does not make a sufficient showing as to one prong of the test, the other prong need not be considered.  *Tucker v. Johnson*, 115 F.3d 276, 281 (5th Cir. 1997).  The prongs of the test also need not be analyzed in any particular order.  *Goodwin v. Johnson*, 132 F.3d 162, 172 n.6 (5th Cir. 1997).  Furthermore, "mere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional issue."  *Green v. Johnson*, 160 F.3d 1029, 1042-43 (5th Cir. 1998).

In applying the first prong of *Strickland*, a court should presume that the attorney's actions are encompassed within the wide range of reasonable competence and fall under the ambit of trial strategy.  *See Strickland*, 466 U.S. at 689-90.  The petitioner must show that the performance of counsel fell "outside the wide range of professionally competent assistance."  *Id.* at 690; *Ward v. Whitley*, 21 F.3d 1355 (5th Cir. 1994).

To establish prejudice, the second prong, the petitioner must demonstrate that counsel's actions "were so serious as to render the proceedings unreliable and fundamentally unfair."  *U.S. v. Saenz-Forero*, 27 F.3d 1016, 1021 (5th Cir. 1994); *Murray v. Maggio*, 736 F.2d 279 (5th Cir.

18

1984).  Unreliability and unfairness do not result "if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993); *see also Mangum v. Hargett*, 67 F.3d 80, 84 (5ᵗʰ Cir. 1995).  Accordingly, counsel cannot be ineffective for failing to raise a meritless claim, *Sones v. Hargett*, 61 F.3d 410, 415 n.5 (5ᵗʰ Cir. 1995), and prejudice generally exists only if the defendant demonstrates that he would have received less jail time.  *U.S. v. Grammas*, 376 F.3d 433, 436 (5ᵗʰ Cir. 2004).

Finally, when review is governed by the AEDPA, review of the state court's resolution of the ineffective assistance of counsel claim is "doubly deferential," *Knowles v. Mirzayance*, 556 U.S. 111, 112 (2009), since the question is "whether the state court's application of the *Strickland* standard was unreasonable."  *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011).  Importantly, "[t]his is different from asking whether defense counsel's performance fell below *Strickland's* standard," because the "state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself."  *Id.*  Consequently, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable."  *Id.* at 786.  To obtain relief, a Petitioner must show that the state court's ruling on the claim was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Id.* at 786-87.

i. Denial of the Right to Testify

Petitioner first claims that counsel was ineffective because counsel prevented Petitioner from testifying, despite the fact that Petitioner repeatedly informed counsel of his desire to testify.

19

[doc. # 6, p. 24].  According to Petitioner, "Counsel informed [him] that he could not testify due

to his medication regimen and [also] that counsel controlled the decision."  *Id.*  In support,

Petitioner attaches a purported affidavit signed by trial counsel which states: "That I, LeRoy

Smith, Jr., informed my client, Robert Todd Griffin, not to take the stand to testify at his May 5-

May 7 2008, trial in Tensas Parish, Louisiana.  That Mr. Griffin requested to testify; however, due

to the number of different narcotic medications he was taking due to a recent surgery and

hospitalization, I advised him against such.  I also informed the trial court on the record that it

would be very prejudicial if he took the stand, due to his intoxication."  [doc. # 42-2, p. 1].

The Louisiana Second Circuit, on collateral review, denied Petitioner's claim.  [doc. # 12-

9, p. 69].  The court explained:

> The trial court did not err in denying Griffin the requested relief.  Griffin fails to
> provide factual support that he was informed by his trial attorney that he was legally
> prohibited, or otherwise compelled, not to testify at his trial.  Although Griffin
> attaches a purported affidavit signed by his trial counsel, the affidavit indicates that
> his trial counsel simply advised him not to testify.

*Id.* (internal citation omitted).

A criminal defendant has the right to testify in his own defense.  *U.S. v. Flores–Martinez*,

677 F.3d 699, 708 (5th Cir. 2012) (citing *Harris v. N.Y.*, 401 U.S. 222, 225 (1971).  The decision

to testify is "ultimately for the accused to make."  *Wainwright v. Sykes*, 433 U.S. 72, 93 n.1

(1977).  When a petitioner argues that his attorney interfered with his right to testify, this Court

applies the *Strickland* standard.  *See U.S. v. Willis*, 273 F.3d 592, 598 (5th Cir. 2001).  But to

begin to apply the *Strickland* standard, Petitioner must first show that counsel did in fact interfere

with his right.  In other words, "although the ultimate decision whether to testify rests with the

defendant, he is presumed to assent to his attorney's tactical decision not to have him testify."

*Flores-Martinez*, 677 F.3d at 711.  To be sure, Petitioner's "failure to stand up in court and to insist on testifying is not dispositive of the issue whether he acquiesced in his attorney's decision that he not testify." *U.S. v. Araujo*, 77 Fed. Appx 276, 278 (5th Cir. 2003).  But, "a petitioner in a habeas proceeding cannot prevail on such a claim merely by stating to the habeas court that he told his trial attorney that he wished to testify and that his attorney forbade him from taking the witness stand." *Turcios v. Dretke*, 2005 WL 3263918, at *6 (S.D. Tex. Nov. 29, 2005).

Here, Petitioner's proffered affidavit only indicates that counsel advised Petitioner not to testify, not that counsel prevented Petitioner from testifying.  Aside from the affidavit, Petitioner presents no evidence to establish that his attorney forbade or prevented him from testifying.  Instead, the record shows that Petitioner must have acquiesced to what appears to have been the sound advice of counsel.

Moreover, the prejudice prong of the *Strickland* test is not satisfied.  Even assuming that counsel did interfere with Petitioner's right to testify, there is no reasonable probability that, absent counsel's interference, the outcome of Petitioner's trial would have been different.  Aside from vaguely arguing that "[i]t was imperative that he (Petitioner) testify . . . to refute the false suggestions and assumptions made by the State regarding his alleged intent to harm and rob Mr. James Hill," Petitioner does not specify what he would have testified to that might have altered the trial's outcome.

Petitioner's assertions fail to demonstrate the existence of any constitutional violation.  Accordingly, and for the reasons stated above, this Court cannot say that the state *habeas* court's denial of this claim was an unreasonable application of *Strickland*.  This claim should be **DENIED**.

21

ii. Failure to Interview, Prepare, and Timely Procure an Expert Witness

Petitioner claims that counsel was ineffective because counsel hired an expert, Dr. Baker, only one day before trial began, failed to interview the expert prior to calling the expert at trial, did not supply the expert with any of Petitioner's medical records prior to trial, did not arrange a meeting between the expert and Petitioner, and failed to investigate the substance of the expert's testimony.  [doc. # 6, p. 27-28; # 45, p. 28].  The state *habeas* court denied relief on this claim. [doc. # 12-9, p. 46].  The court explained and concluded: "Essentially the petitioner argues that his counsel was ineffective because the defense of intoxication did not result in an acquittal.  The decision of counsel and the defendant to present Dr. Baker as an expert witness was a strategic one that should not be second guessed."  *Id.*

At trial, counsel attempted to show, through Dr. Baker's testimony, that Petitioner was intoxicated—due to ingesting cocaine, Xanax, marijuana, and alcohol—and did not possess the requisite intent to commit the crime.  [doc. # 12-6, p. 121-126].  Initially, on direct examination, Dr. Baker testified that Petitioner's ability to reason was "substantially impaired" on the night of the crime.  *Id.* at 127.  However, on cross-examination, Dr. Baker concluded that Petitioner was capable of and did form the intent to commit the crime.  *Id.* at 129, 136.

Here, with respect to Petitioner's claims that counsel retained Dr. Baker too late and failed to interview Dr. Baker, the Court finds that there is no factual basis to grant relief because Petitioner fails to come forth with any adequate evidence to support these claims.  As to the former claim, Petitioner does present the Court with a purported copy of a check made out to Dr. Baker from counsel's firm one day prior to trial; however, this evidence only shows when counsel paid Dr. Baker, not when he retained Dr. Baker.  [*See* doc. # 42-2, p. 2].  Similarly, as to

the latter claim, Petitioner fails to provide any evidence indicating what counsel did or did not

discuss with Dr. Baker.

In any event, even if Petitioner could show that counsel failed to retain Dr. Baker within a

reasonable time in advance of trial or failed to interview Dr. Baker prior to trial, Petitioner fails

to show that, had counsel retained or interviewed Dr. Baker earlier, Dr. Baker would have

testified differently and Dr. Baker's different testimony would have altered the outcome of the

judge's final decision.  To be sure, Petitioner does make several arguments in this regard.  For

instance, Petitioner argues:

> (1) Had counsel prepared Dr. Baker by showing him the pictures of the Hill home,
> Dr. Baker would [have] been aware that the only entry doors used at the Hill home
> face the lake side of the home–thus where Mr. Griffin allegedly parked his car was
> not to avoid police but the closest area to the entry doors.

* * *

> (3) The State led Dr. Baker to believe that Mr. Griffin left the R&B tavern "fleeing"
> police and immediately drove the 1/4 mile to the Hill home knocking on the door
> asking to use the phone.  The facts are that Mr. Griffin left the bar at 11:57 p.m. on
> October 14, 2004 and knocked on the Hill home door at 1:30 a.m. October 15, 2004.
> Thus, his actions in leaving the bar were irrelevant in showing his specific intent and
> state of mind 1 1/2 hours later.

[doc. # 45, p. 25-26].  Petitioner's arguments refer to several hypotheticals[10] that the State posed

to Dr. Baker on cross-examination in an effort to prove that Petitioner was not so intoxicated that

he could not form specific intent.  For instance, the prosecutor posed the following hypothetical:

> State: If someone is at a bar and they are aware that the owner of the bar is not happy
> with them and has called the police, and they leave or flee the scene, does that
> indicate, doesn't that indicate to you that that person understood that

---

[10] Although the hypotheticals closely approximate the actual events in question, the prosecutor and the trial court both made clear that the questions posed to Dr. Baker were only hypotheticals.  [doc. # 12-6, p. 137].

* * *

State: Okay, well does that indicate to you that he was aware that he was in trouble with the bartender and left the scene?

Dr. Baker: Yes.

State: Okay.  Does that indicate that his mind was functioning, he at least understood the situation and fled the scene or left the scene?

Dr. Baker: Yes, he was aware of the fact that he needed to leave because if he didn't, he knew the bartender had called the police, was my understanding of that. And so he was going, "I better get out of here. I've got to leave."

* * *

State: Okay.  All right, what about the fact that he took his car and parked it behind [the victim's house].  He was trying, do you understand he was trying to avoid the police at that point?

Dr. Baker: Right, he was taking evasive action.  Yes, he was, he was going "Okay, I'll, the police are gonna be coming as a result of the bartender calling."  This is my own scenario but, "The police are gonna be coming.  I've been drinking excessively. I better get my car outa here because if they see my car, they'll know where I'm at." And so that's what he was doing.

State: Okay.  And so if you would assume these fact[s] that I'm gonna tell you, that he parked his car in between a residence, Mr. Hill's residence, and the Lake which arguably cannot be detected from the road by police.  Doesn't that indicate that he was still lucid enough to be taking evasive action from the police?

Dr. Baker.  Yes, he was still taking evasive action at that time.

[doc. # 12-6, p. 136-138].  A review of the trial colloquy shows that Dr. Baker's testimony would

not have been any different if counsel had informed Dr. Baker of the information that Petitioner

proffers because the questions posed to Dr. Baker were only hypotheticals, and Dr. Baker's

answers addressed only the facts in those hypotheticals.  At bottom, Petitioner fails to explain

how Dr. Baker could have formulated a more favorable opinion if counsel retained, interviewed,

or informed Dr. Baker of Petitioner's proffered facts at an earlier time.

Moving on, Petitioner also fails to come forth with any evidence to support his assertions that counsel failed to supply the expert with any of Petitioner's medical records and failed to arrange a meeting between the expert and Petitioner.  In fact, contrary to these assertions, the record shows that on January 26, 2005, well before trial, Dr. Baker met with Petitioner and reviewed his medical records.  [doc. # 12-1, p. 64-66].[11]  While the meeting and review of records was not at counsel's behest, the two events nevertheless occurred.  Perhaps even more important, a review of the record makes clear that Dr. Baker reviewed the meeting with Petitioner, as well as Petitioner's medical records, shortly before he rendered an opinion at trial. [doc. # 12-6, p. 125-127].

Finally, Petitioner alleges ineffectiveness as a result of counsel's alleged failure to investigate the substance of Dr. Baker's testimony.  [doc. # 45, p. 28].  Petitioner explains that counsel's performance was deficient because, had counsel investigated Dr. Baker's testimony, counsel would have known that Dr. Baker was going to testify that Petitioner did have the requisite intent to commit the crime.  *Id.*  Petitioner cites Sixth Circuit authority holding that counsel "cannot be deemed effective where he hires an expert consultant and then either willfully or negligently keeps himself in the dark about what that expert is doing, and what the basis for the expert's opinion is."  *Richey v. Bradshaw*, 498 F.3d 344, 361-62 (6th Cir. 2007).

Counsel's decision to call an expert who would eventually testify that Petitioner had the intent to commit the crime is indeed troubling, especially when it appears that counsels' sole reason for calling the expert was to show that Petitioner did not possess the requisite *mens rea*.

---

[11] Dr. Baker met with Petitioner to determine Petitioner's competency to stand trial.

At trial, Dr. Baker blatantly testified, "I think he formed the intent to beat Mr. Hill."  [doc. # 12-6, p. 129].  He then added, "Yes, I certainly think he was, it was, that's I'm sure was his intent, certainly."  *Id.*  Ultimately, however, while the Court shares Petitioner's concern with counsel's performance, Petitioner fails to demonstrate prejudice.

Petitioner argues that he was prejudiced by counsel's decision because the trial judge emphasized Dr. Baker's testimony when rendering his decision.  *Id.*  Indeed, Dr. Baker's testimony likely influenced the judge's decision as the judge referenced Dr. Baker's finding of intent numerous times.  [doc. # 12-6, p. 182].  For instance, the judge stated that Dr. Baker agreed with the State's expert's finding that "the actions attributed to the defendant demonstrated that he could and did form the intent to commit the beating of Mr. Hill."  *Id.*  However, while appealing at first glance, closer examination reveals that Petitioner's prejudice argument is unavailing.

To explain, had counsel chosen not to call Dr. Baker, all of the circumstantial evidence, as well as the State's expert's testimony would have still established that Petitioner possessed the necessary *mens rea*.  Dr. Baker's testimony, in other words, was simply consistent with the other evidence indicating that Petitioner intended to commit the crime and there is no reasonable probability that, without Dr. Baker's testimony, the judge would have rendered an opposite decision.[12]

---

[12] Notably, Petitioner does not claim that counsel should have retained an expert that would have testified that Petitioner did not possess the intent to commit the crime.  In his reply brief, Petitioner emphasizes, "The crux if this issue is **NOT** that trial counsel failed to procure an adequate witness to testify regarding Mr. Griffin's mental state at the time of the event in question . . . ."  [doc. # 45, p. 25].  Thus, with respect to the prejudice inquiry, the relevant question is not whether the judge would have decided differently if counsel had retained a more favorable expert, but whether the judge would have decided differently had counsel never made

Accordingly, this permutation of Petitioner's ineffective assistance claim lacks merit and should be **DENIED**.

    iii. <u>Ineffective Assistance of Appellate Counsel</u>

Petitioner claims that both of his appellate attorneys, Aberle and Idoyaga, were ineffective.  [doc. # 45, p. 29].  The Louisiana Appellate Project initially assigned Attorney Idoyaga to handle Petitioner's criminal appeal.  [doc. # 12-7, p. 23].  Attorney Idoyaga authored Petitioner's original appellate brief before the Second Circuit Court of Appeal.  *Id.* at 28.  On October 19, 2009, the Louisiana Appellate Project assigned Attorney Aberle to handle the remaining portions of Petitioner's appeal.  *Id.* at 44.  Attorney Aberle authored Petitioner's reply brief.  [doc. # 12-7, p. 108].

To prove that an appellate counsel was ineffective, a petitioner must satisfy the two-prong test enunciated in *Strickland*, *supra*, that counsel's performance was deficient and that the deficient performance prejudiced the defense.  *See Busby v. Dretke*, 359 F.3d 708, 714 (5th Cir. 2004).  An appellate counsel's performance may not be deemed deficient for failing to argue a frivolous or non-meritorious claim.  *Smith v. Robbins*, 528 U.S. 259, 285 (2000).  Similarly, a showing of prejudice requires that a petitioner show a reasonable probability that he would have succeeded on appeal but for his counsel's deficient representation.  *Briseno v. Cockrell*, 274 F.3d 204, 207 (5th Cir. 2001).

<u>Attorney Idoyaga</u>

Petitioner first claims that Attorney Idoyaga was ineffective for failing to adequately brief Petitioner's Confrontation Clause argument.  [doc. # 45, p. 29].  As Petitioner points out, counsel

the decision to call Dr. Baker in the first place.

27

did argue that Petitioner was denied his right to confront his accusers but he failed to argue that the victim's statements to Deputy Guy's were testimonial.  [doc. # 12-7, p. 33-35].  That said, Petitioner also points out that he was able to argue, in his *pro se* brief, that the victim's statements were testimonial.  [doc. # 45, p. 29].  In fact, according to Petitioner, his own brief "was the sole basis for the [appellate court] ruling that there was no ongoing emergency and [that] deputy Guy's alleged statements were testimonial."  *Id.*  Unwittingly, Petitioner has demonstrated that Attorney Idoyaga's omission did not prejudice the appeal because Petitioner presented the omitted argument to the appellate court prior to the court's ruling and, moreover, the appellate court actually ruled in Petitioner's favor on this particular issue.[13]

Petitioner next claims that Attorney Idoyaga was ineffective because he included several misrepresentations of fact in the original brief.  *Id.* at 30.  Petitioner presents three alleged misrepresentations as follows:

(1) Mr. Griffin did not "shortly afterwards" leave the R&B tavern and go to Mr. Hill's home.  The evidence showed that he left the bar at 11:57 p.m. on 10/14/04 and knocked on the Hill door at approximately 1:30 a.m. on 10/15/04.  This was used by the State to somehow indicate specific intent when he left the bar 1 1/2 hours prior but counsel missed this issue.

(2) Counsel asserts that Mr. Griffin was charged with murder at one point in the history of the case.  However, Mr. Griffin was never charged with murder in this case at any time.

* * *

(4) Counsel argues that the *Giles v. California* forfeiture by wrongdoing case which has NO relevance whatsoever to Petitioner's claim.

---

[13] As mentioned above in Section B(ii), the appellate court ruled that the victim's statements to Deputy Guy were testimonial in nature but ultimately denied relief after finding that the trial court's error was harmless.  *Griffin*, 30 So. 3d at 1048.

*Id.* at 30-31.  However, Petitioner fails to explain how these alleged misrepresentations prejudiced his appeal.  Given Petitioner's failure, as well as the Court's own inability to find prejudice, the Court concludes that the alleged misrepresentations were immaterial and that there is no reasonable probability that Petitioner would have succeeded on appeal but for these alleged misrepresentations, especially considering the overwhelming evidence of Petitioner's guilt.[14]

Petitioner also argues that Attorney Idoyaga was ineffective for misrepresenting the following:

(3) Counsel states that Mr. Hill's testimony was only presented through Deputy Guy leaving Ms. Crow and that issue out of the argument.

\* \* \*

(5) Counsel informs the Court of appeal that no physician examined Mr. Griffin on the day of the trial and then bases his competency argument on that misstatement, missing the real issues.

[doc. # 45, p. 31].  Again, however, Petitioner fails to demonstrate that he was prejudiced by these alleged misstatements.  In fact, Petitioner was able to correct these misstatements—or omissions—and presented to the appellate court exactly what he alleges counsel failed to present. With respect to the former misstatement, Petitioner argued in his *pro se* brief that his Confrontation Clause rights were violated when the trial court allowed Ms. Crow to testify about the victim's statements.  [doc. # 12-7, p. 71].  Petitioner raised the latter argument in his *pro se*

---

[14] The Court also observes that Petitioner was able to inform the appellate court—prior to the appellate court's ruling—that he left the R&B tavern at 11:51 p.m. and arrived at the Hill residence at 1:30 a.m.  [doc. # 12-7, p. 69].  Thus, Petitioner was not prejudiced by counsel's alleged misstatement because the appellate court was able to take these facts into consideration prior to issuing its opinion.

reply brief.  *Id.* at 105.  This claim should be **DENIED**.[15]

<u>Attorney Aberle</u>

Petitioner claims that Attorney Aberle was ineffective because counsel did not have enough time to read and study the record.  [doc. # 45, p. 30].  Petitioner elaborates, "The failure of the appellate court to allow a brief extension of time for Mr. Aberle to adequately represent Mr. Griffin . . . was unreasonable and overwhelmingly prejudicial to Mr. Griffin."  *Id.*

Petitioner's ostensible ineffective assistance claim is styled in terms of appellate court error.  To the extent that Petitioner is claiming that the appellate court erred in failing to grant an extension of time, Petitioner fails to allege any constitutional violation.[16]  To the extent that Petitioner does raise an ineffective assistance of counsel claim, he raises it in a wholly conclusory fashion and fails to allege any specific facts that might illuminate a deficiency in counsel's performance.  Petitioner's conclusory assertion does not warrant *habeas* relief.  *See Uresti v. Lynaugh*, 821 F.2d 1099, 1103 (5th Cir. 1987) (holding that a *habeas* petitioner has the burden of proving facts in support of his or her claim and unsupported, conclusory allegations do not warrant *habeas* relief).  Petitioner's claim should be **DENIED**.

D. <u>Claim Seven: Access to Post-Conviction Relief</u>

Petitioner alleges that he "was denied due process of the law when he was denied

---

[15] The Court also finds that counsel was not deficient for omitting these facts and arguments because they relate to claims that the Court has already found to be meritless.  To reiterate, counsel's performance cannot be deemed deficient for failing to argue a meritless claim.

[16] "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).

adequate access to state habeas procedures."  [doc. # 45, p. 32].  His claim centers around the

state *habeas* court's denial of his motion to produce documents and audio files.  [doc. # 1, p. 22].

He also takes issue with the state court's summary dismissal of his claims, as well as the court's

failure to grant an evidentiary hearing.  *Id.* at 23.

However, infirmities in state *habeas corpus* proceedings do not state a claim for federal

*habeas corpus* relief.  *Vail v. Procunier*, 747 F.2d 277 (5th Cir. 1984); *see Trevino v. Johnson*,

168 F.3d 173, 180 (5th Cir. 1999).  This is because "an attack on the state habeas proceeding is an

attack on a proceeding collateral to the detention and not the detention itself."  *Rudd v. Johnson*,

256 F.3d 317, 320 (5th Cir. 2001).   Accordingly, this claim is not cognizable under federal

*habeas corpus* review and should therefore be **DENIED**.

## Conclusion

For the reasons stated above, **IT IS RECOMMENDED** that the Petition for writ of

*habeas corpus* filed by Petitioner Robert Todd Griffin, [doc. # 1], be **DENIED and**

**DISMISSED WITH PREJUDICE**.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule 72(b), parties aggrieved by

this Recommendation have **fourteen (14) days** from service of this Report and Recommendation

to file specific, written objections with the Clerk of Court.  A party may respond to another

party's objections within **fourteen (14) days** after being served with a copy of any objections or

response to the District Judge at the time of filing.  A courtesy copy of any objection or response

or request for extension of time shall be furnished to the District Judge at the time of filing.

Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED**

**FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts, this Court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. Unless a Circuit Justice or District Judge issues a certificate of appealability, an appeal may not be taken to the court of appeals. **Within fourteen (14) days from service of this Report and Recommendation, the parties may file a memorandum setting forth arguments on whether a certificate of appealability should issue.** *See* 28 U.S.C. § 2253(c)(2). **A courtesy copy of the memorandum shall be provided to the District Judge at the time of filing.**

In Chambers, Monroe, Louisiana, this 14th day of May, 2014.

KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE